## BIG HORN POWER COMPANY v. STATE OF WYOMING.

(No. 806;  Decided June 1st, 1915;  148 Pac. 1110.)

ABATEMENT OF PUBLIC NUISANCE BY THE STATE—PUBLIC NUISANCE
DEFINED—APPEAL AND ERROR—ATTORNEY GENERAL—SUIT BY STATE
IN SOVEREIGN CAPACITY—WATER AND WATER COURSES—DAMS—
POWER PERMITS—POWER DAMS—VIOLATION OF CONSTRUCTION
PERMIT—STATE ENGINEER—APPEAL FROM ENGINEER'S DECISION—
APPROVAL OF PLANS—AMENDED PLANS—RESERVOIR CONSTRUCTION
—FINDINGS OF TRIAL COURT—REVIEW OF FINDINGS—ESTOPPEL—
COMPENSATION FOR PROPERTY TAKEN—WORDS AND PHRASES.

1. The state in its sovereign capacity and by virtue of its cor-
porate rights has inherent power to sue in its own court
for the abatement of a public nuisance, even if it be in the
form of a structure originally established under the sanc-
tion or approval of one of its officers, which thereafter
develops into a public nuisance.

2. Comp. Stats. 1910, Sec. 145, defining the duties of the Attor-
ney General, is sufficiently broad, in the absence of other
statutory provisions regulating the matter, to authorize the
prosecution of an action by that officer in the name of the
state for the abatement of a superstructure erected on the
top of a power dam without state approval, the existence
of which constituted a public nuisance.

3. Where a power company submitted plans to the State En-
gineer pursuant to Comp. Stats. 1910, Sec. 825, for the
construction of a dam across the channel of a running

stream, which were approved, but materially deviated from in the construction of the dam by the erection of a super-structure on the top of the dam that raised the water higher in time of freshet than was contemplated by the plans, thereby flooding the tracks and tunnel of a railroad traversing the canon and seriously endangering its opera-tion, such superstructure constituted a public nuisance open to abatement on suit of the state.

4. Where the state sued to abate, as a public nuisance, a super-structure consisting of concrete piers resting on the top of a power dam and designed to support an overhead bridge across the stream, wherein the dam was located and being in excess of the plans approved by and filed with the State Engineer for the construction of the dam, which superstructure caused flood water to inundate a nearby railroad and endanger its operation, a court decree re-quiring the removal of such superstructure did not involve a destruction of private property without compensation, since it was an unlawful structure and its removal was a proper exercise of police power.

5. The findings of a trial court when supported by evidence will not be distributed on appeal.

ERROR to the District Court, Fremont County; HON. CHARLES E. WINTER, Judge.

The material facts are stated in the opinion.

*Ben Sheldon* and *P. B. Coolidge,* for plaintiff in error.

The plaintiff below had no sufficient interest in the sub-ject matter of the action to maintain the suit. The action was brought in the interest of another. The evidence failed to establish allegations that the dam and superstructure is a public nuisance. Plaintiff in error constructed its dam under a permit from the state; the crest of the dam may be widened, if necessary, without destroying the property. The decree of the trial court deprives plaintiff in error of its property without due compensation, contrary to the pro-visions of the constitution of the state and of the United States. The real party in interest is the Chicago, Burlington & Quincy Railroad Company and not the general public. The dam was constructed prior to the location of the rail-road line through the canon. A railroad is not a public

highway; if the things complained of were actionable, only the Railroad Company could bring the action. It is unnecessary to remove the superstructure in order to lessen the depth of the water on the crest of the dam. A nuisance is public when it affects the rights to which every citizen is entitled. (29 Cyc. 1152; City of Paris v. Comm., 4 Ky. L. R. 497.) It is such an offense as annoys the whole community in general and not merely some particular person. (Veazie v. Dromel, 50 Me. 479, 481; U. S. v. Debs, 64 Fed. 724-770; Doolittle v. Broome, 16 How. Prac. 512-517; Village of Cardington v. Fredericks, 21 N. E. 766-767, and 46 O. S. 442; King v. Morris and E. R. Co., 18 N. J. Eq. (3 C. E. Arun.) 397-399; Moffett v. Brower, 1 Green (Iowa), 348.) A private nuisance is anything done to the hurt or detriment of the lands of another and not amounting to a trespass. (29 Cyc. 1152; Veazie v. Dromel, 50 Me. 479, 482; Chicago N. S. St. Ry. Co. v. Payne, 61 N. E. 467-468, 192 Ill. 239; Calef v. Thomas, 81 Ill. 478-480; Payne v. Kansas & A. V. R. Co., 46 Fed. 546-553; Cansig v. Smith, 21 Am. Dec. 89; Fox v. Buffalo Park, 47 N. Y. Supp. 788-790, and 21 App. Div. 321; Swords v. Edgar, 59 N. Y. 28-34, and 17 Am. Rep. 295; Cropsy v. Murphy (N. Y.), 1 Hilt, 126-127; Caldwell v. Knott, 11 Tenn. (10 York) 209-210; Burditt v. Swanson, 11 Tex. 489; Ackiman v. True, 67 Am. Dec. 665, 67 N. E. 630, 175 N. Y. 353.) The remedy is action for damages. (Lee v. Vacuum Oil Co., 54 Hun, 156, 7 N. Y. Supp. 426; Hug v. Licht, 80 N. Y. 579, 36 Am. Dec. 654, 8 Abb. N. C. 355-359; Powell v. Bently & Gerwig Lumber Co., 34 W. Va. 804-807, 12 S. C. 1085-1086, 12 L. R. A. 53.) A public nuisance becomes a private nuisance as to the person who is specially injured thereby in the enjoyment of his lands. (Kavanaugh v. Barber, 30 N. E. 235, 131 N. Y. 211, 15 L. R. A. 689; Kissel v. Lewis O., 59 N. E. 478, 481, 156 Ind. 233.) Under these definitions the Attorney General had no authority to bring the action and the State had no right of action, for the following reasons: (a) The railroad right of way is not a public highway; (b) the governmental machinery can-

not be used for private purposes; (c) because if the acts complained of constitute a nuisance, it is a private nuisance; (d) the acts complained of only affect private property. But the acts complained of do not constitute a nuisance because (a) the Power Company had a license from the State to erect the dam and its superstructure; (b) the railroad was located after the construction of the dam and superstructure. The plaintiff in error had a vested right to construct the dam. (a) It was the owner in fee of the land on both sides of the river, where the dam is located. (Griffith v. Holman, 54 L. R. A. 178.) (b) The dam was constructed under a state permit. Under this state of facts, plaintiff had the right to construct the dam and the right to use it, as constructed. (Griffith v. Holman, 54 L. R. A. 178; Dorrance v. Simons, 2 Root (Conn.) 208; Woodward v. West Side Mill Co., 43 Wash. 308, 86 Pac. 579; Waits v. Norfolk &c. R. C., 39 W. Va. 196, 19 S. E. 521, 45 Am. St. Rep. 894, 23 L. R. A. 674; Atty. Gen. v. Evart Browning Co., 34 Mich. 462; People v. Detroit & H. Plank Road Co., 37 Mich. 195, and 26 Am. Rep. 512.) A work which is authorized by law cannot be a nuisance. (People v. Law, 34 Bast. 494, and Danill H. and W. Rl. Co. v. Comm., 73 Pac. 29; Britler v. State, 6 Ind. 165; Patterson v. City of Duluth, 21 Minn. 493; People v. N. Y. Gaslight Co., 64 Bast. 45; York Tel. Co. v. Kiersey Com. Plea, 5 Pa. Dist. R. 366; Stoughton v. State, 5 Wis. 291.) The flow over the crest of the dam can be regulated without removing the superstructure; courts will not grant mandatory injunctions for the destruction of property, where other remedies exist. (1 High on Injunctions (4th Ed.), Sec. 2; Maghie Gold Mining Co. v. Sherman, 20 Am. & Eng. Anno. Cases, 595; 22 Cyc. 742.) The evidence shows that other remedies exist for controlling the depth of the water flowing over the dam. The execution of the decree below would result in taking private property without due process of law and without compensation, contrary to the constitution of the state and of the United States.

*D. A. Preston,* Attorney General (*Edward T. Clark*, of counsel), for defendant in error.

A railroad right of way is a public highway. (Cherokee Nation v. Railroad Co., 135 U. S. 641, 34 L. Ed. 302; Railroad Co. v. State of Ohio, 173 U. S. 285, 43 L. Ed. 702; Wisconsin Railroad Co. v. Jacobson, 179 U. S. 287, 45 L. Ed. 194; Lewis on Eminent Domain (3rd Ed.), Vol. 1, p. 511; 22 Cyc. 898; Schnitzer v. Powder Co., 160 S. W. 282; 29 Cyc. 1152.) The above cases support the right to abate, as a public nuisance, acts which endanger the operation of railroads. The Power Company had a permit to erect the dam, but not its superstructure. The approval endorsed by the State Engineer upon the map showing the completion of the dam was not for the purpose of approving the action of the Power Company in building the superstructure. An unauthorized act of a Water Commissioner is not binding on the courts. (Ryan v. Tutty, 13 Wyo. 122, 78 Pac. 661; Kinney on Irrigation, Vol. 3, p. 2442, 2nd Ed.; Farm Inv. Co. v. Carpenter, 9 Wyo. 110; Willey v. Decker, 11 Wyo. 496, 73 Pac. 210; Ryan v. Tutty, 13 Wyo. 122, 78 Pac. 661; Whelan v. North Platte C. & C. Co., 11 Wyo. 313, 71 Pac. 995.) Plaintiff merely held a permit to construct a dam thirty-five feet high. There is no evidence in the record showing that another and sufficient remedy exists to control the depth of the water flowing over the crest of the dam, other than by removing the superstructure. The railroad grade was constructed to accommodate the thirty-five foot dam. A public franchise may be regulated by the state. (Farm Inv. Co. v. Carpenter, 61 Pac. 258; State v. Express Co., 115 Northwestern, 623; Newton v. Mahoning Co. Comm., 100 U. S. 548, 25 L. Ed. 710; People v. Page, 39 N. Y. A. P. D. 110, 56 N. Y. State, 834, 58 N. Y. State, 239; Reaves v. Territory, 13 Okla. 396, 74 Pac. 951; People v. Truckee Lumber Co., 116 Cal. 379, 48 Pac. 374, 39 L. R. A. 581; Georgia v. Tenn. Copper Co., 206 U. S. 230; Missouri v. Illinois, 200 U. S. 496.) A menace to the safety of the public may be enjoined. (A. T. & S. F. Ry. Co. v. Spaulding, 77 Pac. 106, 66 L. R. A. 587, 105 Am. State

Reports, 175; Atty. Gen. v. Hudson County Water Co., 76 Atl. 560; Atty. Gen. v. Shrewsbury Bridge Co., 21 Ch. Div. 752.)

*W. E. Mullen,* for defendant in error.

The Power Company violated its permit granted for the construction of a power dam and this suit was brought to require the holder of the permit to construct the dam in accordance with the terms of the permit. The state has authority to regulate structures intended for the impounding of water; but no legal remedy for the enforcement of this authority where permits are violated has been provided by statute. (Comp. Stats. 1910, Secs. 825 to 827, inclusive, and 743 to 752, inclusive.) An applicant for a permit feeling aggrieved by a ruling or decision of the State Engineer may appeal. (Comp. Stats. 1910, Sec. 723.) The State Engineer had authority to reject the original application for a permit made in this case. (Comp. Stats. 1910, Sec. 729; Whalon v. North Platte C. & C. Co., 11 Wyo. 342, 71 Pac. 997.) The state may sue in its own courts. (Ex parte Siebold, 100 U. S. 395; People v. St. Louis, 10 Ill. 351; People v. Truckee Lumber Co., 116 Calif. 397, 39 L. R. A. 581, 48 Pac. 374; Hagne v. Wheeler, 157 Penn. 340, 22 L. R. A. 141; State ex. rel. McCain v. Melachan, 31 Ore. 372, 41 L. R. A. 592, 46 Pac. 791; Coosaw Mining Co. v. South Carolina, 144 U. S. 566; Nebraska v. Express Co., 115 N. W. 619; Ohio Oil Co. v. Indiana, 177 U. S. 199.) It may sue in its sovereign capacity and by virtue of its corporate rights. (Indiana v. Kentucky, 136 U. S. 479; State v. Portsmouth Savings Bank, 106 Ind. 435; State v. Adams Express Co., 144 Ind. 549; Adams Express Co. v. Indiana, 165 U. S. 255; Missouri v. Illinois, 180 U. S. 208; Missouri v. Illinois, 200 U. S. 496; Colorado v. Kansas, 185 U. S. 125; Colorado v. Kansas, 206 U. S. 46; Georgia v. Tenn. Iron Co., 206 U. S. 230.) The superstructure erected on this dam was a public nuisance within the settled meaning of the term. (State v. Crawford, 28 Kan. 726, 42 Am. Rep. 182; Coosaw Mining Co. v.

S. C., 144 U. S. 586; State v. Ohio Oil Co., 151 Ind. 21; Augusta v. Reynolds, 122 Ga. 754, 69 L. R. A. 564, 106 Am. State Reports, 147; State v. Vandalia, 119 Mo. App. 406; State v. Col. Water Power Co., 82 S. C. 181, 63 S. E. 884, 22 L. R. A. N. S. 435; State v. Franklin F. Co., 49 N. H. 240, 6 Am. Rep. 513; Mining Debris Case, 9 Sawyer, 441, 18 Fed. 753.) The railroad grade was constructed after a permit had been granted for a thirty-five foot dam. Defendant's approval map marked Exhhibit One was merely in the nature of a report of what had been done under the permit, but could not operate to enlarge the permit itself, which had never been altered, amended or modified. A permit is in the nature of a public franchise and confers no rights beyond its express terms. (Ex parte Russell, 126 Pac. 875 (Cal.); Boise City v. Water Co., 186 Fed. 705.) The superstructure walls are distinct from the dam itself for the following reasons: (a) They were not designed to impound water; (b) they were not designed to generate power; (c) they were designed to support a bridge over the stream across the top of the dam. A removal of the superstructure would not destroy the dam for the following reasons: (a) Such removal would relieve the weight of water upon the dam in time of flood; (b) such removal would lessen the danger of the destruction of the dam by permitting flood water and floating material to pass over. It was made clear by the evidence that the superstructure backs up water and catches logs, driftwood and ice, all resulting in a menace to transportation and danger to life and property. The decree of the court below condemned the superstructure, but not the dam itself. There is no authority of law for a State Engineer to grant permits for the construction of bridges across natural streams. Water and power permits must be confined to the use of public water for a beneficial use.

Scott, Justice.

This action was instituted in the District Court of Fremont County on July 24, 1909, by the state in its sovereign

capacity for an injunction and to abate an alleged nuisance consisting of piers and a wagon bridge built upon and above the crest of a dam for water power purposes theretofore constructed on the Big Horn River where the same pierces and crosses the Owl Creek range of mountains, which is alleged to have been in excess of the plans and specifications approved by the State Engineer when the permit was granted for the construction of the dam. The case was tried to the court without the intervention of a jury, and the court found in favor of and gave judgment for the State, and against the Big Horn Power Company, and the latter brings error.

The plaintiff in error's contentions on the briefs are as follows: First: That the defendant in error, plaintiff below, had no sufficient interest in the subject matter of the action and no authority which would or could entitle it to institute, prosecute, or maintain it. And that the action was solely in the interest of another. Second: That the evidence failed to establish the allegations that the dam and superstructure are a nuisance to the general public or a nuisance in any respect whatever or that the removal of the superstructure is necessary to obviate or remedy the things complained of. Third: That the plaintiff in error, defendant below, acquired its right to construct the dam from the defendant in error and the defendant in error approved the dam as constructed and thereby confirmed the right of defendant in error to maintain and enjoy its use as constructed. Fourth: That if the crest of the dam is not long enough to carry the water at a sufficiently shallow depth, this can easily be remedied without destroying any of the property of the plaintiff in error. Fifth: That the decree of the court below would deprive the plaintiff in error of its property and use and enjoyment of it, without due compensation and contrary to the provisions of the Constitution of the State of Wyoming and the United States.

It is said in 36 Cyc., at page 907, that "A state, as plaintiff, may sue in its own courts, and this right, although

sometimes expressly conferred by statute, exists independ-
ently of statute as an incident of sovereignty; and a state
may sue in its own courts both in its sovereign capacity and
by virtue of its corporate rights." We have no statute ex-
pressly regulating the matter, but impliedly the Legislature
has recognized the right. It is provided by Section 145,
Comp. Stat. 1910, that "The Attorney General shall prose-
cute and defend all suits that may be instituted by or against
the State of Wyoming, the prosecution and defense of which
is not otherwise provided for by law." We think this stat-
ute is sufficiently broad to meet any question as to the right
of the state to prosecute the action, *provided* the acts com-
plained of constitute a public nuisance. The facts admitted
by the pleadings, together with the finding upon the issues,
show that the dam was built upon land the fee of which
was in Asmus Boysen; but the water was unappropriated
water of the state, on August 3, 1908, when Asmus Boysen
made application to the State Engineer for permit to con-
struct the Boysen dam to impound water of the Big Horn
River for the purpose of generating electricity, accompany-
ing his application by drawings and plans of the proposed
dam. It was a requirement that he accompany his applica-
tion with plans and specifications so as to disclose sufficient
to enable the State Engineer to judge whether the contem-
plated works and the proposed appliance for conserving and
the application of the water were feasible. It is admitted
that the plans and specifications approved by the State En-
gineer provided for a dam thirty-five feet in height above
mean low water level, and 110 feet along the crest and
which together with rock to be excavated approximating
thirty-three feet in canon walls made flush with the top of
dam was to form a spillway 143 feet in length. Work was
commenced and prosecuted until July 10, 1909, when an
examination by a Deputy State Engineer disclosed that the
construction of the dam had not been carried on in accord-
ance with the plans and drawings, but had exceeded and
departed therefrom in that the excavations in solid rock at
either end of the dam had not been carried out far enough

to provide, in addition to the 110 feet in length on the crest of the dam, a spillway having a total length of 143 feet, and in addition to this the seven concrete supporting walls eighteen feet apart as provided by the plans of construction, as a part of the dam had been carried twenty-nine feet above the thirty-five foot crest of the dam and supported a wagon bridge, and which supporting walls were two feet in thickness at the crest of the dam and taper to a thickness of 18 inches at their top and that the spillway as planned originally was reduced ten feet for this cause and five feet more by the side concrete walls, so that the available spillway length was reduced to 95 feet instead of being 143 feet as the plans required, and also that by carrying the supporting walls above the crest of the dam they not only obstructed the free flow of water above the crest of the dam, but caught drift wood, logs, tree trunks and trash, thereby diminishing and obstructing the spillway and raising the water to a higher level than the crest of the dam. The plans provided that when the reservoir was filled the crest of the dam should be level with the water surface.

The drawing referred to as accompanying the original application were plans for a dam sixty feet in height and showed no proposed superstructure, bridge or supports running up from the crest of the dam or any obstruction to the water flowing over the dam, leaving the spillway as shown by the drawings 143 feet in the clear. Before approving any plans for the dam and for the purpose of procuring further and more exact information, the State Engineer directed a hearing and set the same for February 8, 1908, and upon such hearing the plans and drawings for the dam were approved as in the original application, except that it was reduced to a height of thirty-five feet from mean low water level. Upon that hearing the Chicago, Burlington and Quincy Railroad Company appeared by its attorneys and protested against allowing the dam to be built at a height of sixty feet, as applied for in the original application, as injuring the gorge or canon through which the river ran as a pass for railway purposes. As more clearly show-

ing the condition, we quote the decision of the State En-
gineer made and filed upon the hearing as follows:

"BIG HORN RIVER.

"Before the State Engineer.   Application of Asmus Boy-
sen to build a dam across the Big Horn River in township
5 N., range 6 E., Wind River meridian.

"The Owl Creek Mountains run southeasterly through
the northeastern corner of the ceded portion of the Sho-
shone Indian Reservation.   They connect with the southern
foothills of the Big Horn Mountains near a point common
to Big Horn, Natrona and Fremont Counties.   The Owl
Creek Mountains form the southern rim of the Big Horn
Basin.   The only pass through this range is formed by the
Big Horn River, which runs northerly along the eastern
margin of the ceded lands of the Reservation.   The canon
is about 14 miles long.   Precipitous walls of granite run
almost from the water's edge to great heights in places.
However, the canon offers unusual advantages for railroad
construction, considering the light grade obtainable in com-
parison with the difficulties generally encountered in cross-
ing a chain of mountains.

"At the southern entrance to this canon the Boysen claim
has been located.   The mountains both to the east and to the
west of the Big Horn River promise great mineral develop-
ment.   Coal is expensive throughout this mining region and
gasoline is almost prohibitive in price.   Owing to the scarcity
of water for boilers it is difficult in many places to use coal
to advantage.   The development of electric power seems to
be the only solution of the problem now confronting the
Copper Mountain and Owl Range miners.   This should be
borne in mind, because it is very questionable whether this
mining district will ever develop properly unless cheap
power for drilling and other mining operations and for
transporting the ore to the nearest railroad point can be
obtained.

"On the 13th day of August, 1906, Asmus Boysen of
Gray, Audubon County, Iowa, filed in his own behalf an

application for the 'Boysen Pipe Line' proposing to divert water from the Big Horn River in the northwest quarter of section 4, township 5 N., range 6 E., W. R. M., for the 'generation of electricity and electrical power, for hydraulic mining and for milling purposes.' The pipe line was to have been 3,930 feet long and was to have been 6 feet in diameter. The pipe from the dam to the power house was to have been shelved upon solid rock. The estimated cost of the dam and pipe line was fifty thousand dollars. Under paragraph 11 of the application defining the use in detail occurs the following: 'no irrigation contemplated. It is proposed to develop approximately three thousand to five thousand horse power under a fifty foot head by the use of 600 to 1,000 feet of water. And it is also proposed to use — gallons of water per second for hydraulic mining and to use water for a one hundred stamp mill. Applicant also asks permission to construct a dam across Big Horn River at said point and to raise said dam 35 feet above the bed of the river.' This application was given the temporary filing number in the State Engineer's office, 5 6/357. It was handed to Fred W. Hart, Mr. Boysen's engineer, on Sept. 21, 1906, for correction.

"On the 27th day of March, 1907, an application from the said Asmus Boysen was received by the State Engineer for the 'Boysen Power Line No. 1.' This application was returned to Mr. Boysen for correction on the 13th day of April, 1907, and has not been returned to the State Engineer's office. Its temporary number is 6 4/69.

"On the 27th day of November, 1907, the first application No. 5 6/357 was returned to the State Engineer's office with amended maps and plans, as well as an amended application. This application is prepared on the reservoir form, while the original filing, 5 6/357, was on the form provided for ditches and pipe lines. The application is prepared in the name of the said Boysen and for similar purposes. It proposes the construction of a dam 60 feet in height over which water is to run ten feet in depth during flood seasons. The

estimated cost of the reservoir is one hundred and twenty-five thousand dollars.

"Before this application was taken up for consideration by the State Engineer, a request was made by attorneys representing the Chicago, Burlington & Quincy Railroad, that before action were taken they should like to have a hearing, because the construction of a dam seventy feet in height across the canon of the Big Horn River tended to impair the right of way of said road through said canon. In accordance with this request, the case was set to be heard on the 15th day of January, 1908, in the office of the State Engineer, and Attorneys Burke & Clark for said railroad and Attorney John W. Lacey, representing the said Boysen, were accordingly notified.

"Upon the day set for said hearing the parties interested were represented by their attorneys, who discussed the legal phases of the questions in issue. Engineers representing the interested parties and the right of way agent of the said railroad were duly sworn and thereafter examined as to the physical conditions presented by the canon and the conflict in the rights of the interested parties were in this manner made clear.

"One important question before the State Engineer concerns his authority under Section 919, Revised Statutes of 1899.

"It is plain that when Mr. Boysen's company develops only such power as is needed in its own operations it stands on a different footing than it does when it becomes a public service corporation organized for the purpose of disposing of power to others. When it reaches the latter stage it has the same standing as the railroad, the one furnishing power and the other transportation to the public. As the plans of Mr. Boysen's company provide for the development of power both for the use of his company, and for others, the State Engineer should, if he has authority under said Sec. 919, determine, if possible, how the application before him should be handled so that the permit issued will not 'threaten to prove detrimental to public interest.'

"The State Engineer cannot judge as to the validity of the right of way claimed by the said railroad. He knows that an excellent water grade from the northern part of Big Horn County to and through said canon, thence easterly to and down the Platte River to the Nebraska line, can be obtained; that this would naturally be taken advantage of by some railroad and that by so doing freight and passenger rates would be favorable to Wyoming shippers; that if a dam 60 feet high with a depth of water of 70 feet were to be built at the southern entrance to the canon the grade through the canon would be increased to and beyond the limit established for the line as a whole; that this added grade will require more motive power at this point and that this extra expense must be borne indirectly by the shipper.

"The testimony brought out the statement that a dam 60 feet in height enclosing the power plant is as cheap as a 35-foot dam with an independent power house; that with the higher dam from five to six times the power can be created as under the lower dam; that a 35-foot dam would develop enough power for the applicant's own use, but to serve the surrounding mining country as much as 5,000 horse power should be developed.

"The first application filed by said Boysen shows that with a pipe line and a dam 35 feet in height from 3,000 to 5,000 horse power can be developed at an estimated cost of fifty thousand dollars. By the testimony given before the State Engineer on January 15, 1908, it is shown that it is estimated that 5,000 horse power will be developed with the 60-foot dam. Under the application providing for this dam the estimated cost is one hundred and twenty-five thousand dollars. Taking the lower estimate of 3,000 horse power as given by the first application, we find that under the plans described therein, the power would be developed for $16.66 per H. P., while under the second application the power development would cost $25.00 per H. P.

"Opportunities for power development are numerous throughout the state. Their location near to the point where the power is to be applied is always a favorable condition,

yet under modern transmission methods, as Mr. Hart, engineer for Mr. Boysen, testifies, it is not a difficult matter to transmit electric power to distances of 200 miles and over. There are opportunities with 50 of the Boysen dam site where power can be developed at a very reasonable rate per horse power.   A railroad line and a canal line are hedged about by many restrictions.   The canal line must cover certain lands to be reclaimed.   It must have a favorable location throughout and its grade must be such that damage will not result through erosion.   A railroad line to be operated cheaply must avoid steep grades and sharp curves.   Defects either in a canal line or in a railroad line work a perpetual detriment on the public.   In comparison a power plant using water as the primary motive factor is in its location, plans and equipment of great elasticity.   The state has recognized this and permits for power purposes are issued under the conditions that such use is not to interfere with the use of water for irrigation; the final character of the right to be defined by future legislative enactment. The waters of Wyoming nearly all come from the mountains and much of this volume, and all of the late waters, come from above timber line.   This means that in passing from the source of the streams to the boundaries of the state the water falls at least a mile vertically.   The combined flow of our streams is about 11,500,000 acre feet of water per annum, or a continuous average discharge of 15,972 cubic feet of water per second.   This flow with the available fall will produce approximately 8,000,000 horse power.   It does not seem necessary, therefore, that the state, which under the constitution (Sec. 31, Art. 1) 'shall equally guard all the various interests involved,' should permit any power development to increase perpetually either transportation charges or the cost of delivering water through canals and reservoirs, because power plants can be so located that they will interfere with no other industry and yet operate successfully and easily reach a market for the power created.

"No railroad can build through the state from the north-

west and maintain an economical grade without passing through this canon. Successful railroad operation should, and does have a beneficent influence on the public welfare as locally concerned. Any obstacle which threatens to add to the cost of transportation must be considered as coming under the terms of the statute which provides that the State Engineer is to reject any application which 'threatens to prove detrimental to the public interest.'

"An application, when found defective by the State Engineer, is returned by him for correction. It may have been prepared on the wrong blanks as was done in the permits of the said Boysen in issue. It is not presumed either by the law or under the rules of the State Engineer's office that when an application is returned for correction that the fundamental features of the plans set forth in the original papers shall be modified. The application when filed is presumed to represent the objects of the applicant. In order that the application, when returned to the State Engineer for his indorsement, may receive the original filing number, the changes made should embrace only the corrections called for by the State Engineer. The return of the application cannot be considered, under any conditions, to warrant the applicant in altering his plans in any material way. The application is returned for correction—not for a new filing embracing departures from original plans.

"After the consideration of all testimony presented and after having taken up the applications filed in his office in detail, the State Engineer is convinced that the proposed power development, in sufficient magnitude for the applicant's own uses, at least, can be brought about through the construction of a dam not over 35 feet in height, as provided in the original filing. The applicant is therefore called upon to modify his plans to provide for such construction. In case he does not comply with this requirement, his application will be rejected on or after thirty days from this date.        (Signed) Clarence T. Johnston,

"State Engineer.

"Cheyenne, Wyoming, January 27th, 1908."

No appeal was taken from this decision. The petition here, as already stated, was filed in the lower court on July 24, 1909, and on that day, upon application of plaintiff, a temporary injunction was allowed by the court in language as follows: "Upon consideration of the application of plaintiff for a temporary injunction upon its petition duly verified, and the exhibits accompanying and annexed thereto, and it appearing to the court that good cause has been shown why a temporary injunction should issue herein, it is ordered by the court that pending the final hearing and determination of this suit, and until the further order of this court, the defendants, Asmus Boysen and Big Horn Power Company, a corporation, and each of them, their agents, servants and employes, be restrained and enjoined, (1) from constructing, maintaining or using their dam, or any dam, structure or obstruction, in the Big Horn River, and its bed in the channel of said stream in that certain canon several miles in length where said stream flows in its course through what are known as the Owl Creek Mountains, in the County of Fremont, and State of Wyoming, to a greater elevation than thirty-five feet above the mean low water level of said stream, and without an unobstructed and open spillway of one. hundred and forty-three feet at an elevation not exceeding thirty-five feet above the mean low water level of said stream; and (2) from closing, or obstructing, or causing to be closed or obstructed, the two certain water ways underneath said dam until and unless all concrete construction on said dam above the elevation of thirty-five feet from the mean low water level of said stream, together with sufficient rock excavation at either end of the said dam to provide a spillway of one hundred and forty-three feet in length, is removed; and (3) from doing or performing, or causing to be done or performed, any act or acts, that will interfere with or hinder or interrupt or impede the flow of the waters of said Big Horn River in the said canon in its natural course through said Owl Creek Mountains, not expressly permitted by the order and permit of the State Engineer of the State of Wyoming, heretofore

granted, and in accordance with the modified plans of de-
fendant Big Horn Power Company, approved by said State
Engineer."

After issue joined and on November 24, 1909, the parties
by written stipulation agreed: "1. That the defendants be
permitted to install machinery in the interior of said dam.
2. That on and after December 10, 1909, the defendants be
permitted to use and operate, and maintain said dam and
appurtenances as now constructed, pending final hearing and
subject to the rights of the parties as determined by the final
judgment of the court upon the issues joined herein, or by
any court to which it may be taken for review by appeal or
error.   3. That the said order of injunction heretofore
granted herein shall not be affected or modified hereby in
any particular except as hereinabove stated.   Subject to the
foregoing conditions and three items of modification men-
tioned, in order that the effects of another high water may
be experienced before the determination of this suit, it is
hereby stipulated and agreed between the parties that this case
be now continued until July 1, 1910."   The court modified the
injunction and continued the case in accordance with the
stipulation and thereafter continued the case from time to
time until it came on for trial on December 1, 1913.   Prior to
the trial and after it had constructed the dam the Power
Company presented to the State Engineer a "Plan of Asmus
Boysen Dam, Big Horn River, Wyoming, June, 1909,"
which bears this indorsement over the signature of the State
Engineer: "Amended plans approved, July 2, 1913."   The
evidence tended to show that the railroad company con-
structed its road on a grade so as to accommodate the plans
of the dam as originally approved, and active operation of
the road commenced in October, 1913.   The depth of the
gorge or canon, its precipitous and rocky walls and great
depth and the turns in the canon required the construction
of a tunnel near the dam and the evidence tends to show
that in 1911 during high water and while the road was in
process of construction the backwater caused by driftwood
and trees which during the high water season of that year

lodged against the concrete supporting walls and obstructed the free flow of water so that the depth of water on the crest of the dam was 16.7 feet. This back water overflowed the track of the road above the dam so the grade had to be raised two feet to get it out of the water in order to render it safe to run the construction train. The water also ran through the tunnel. The evidence further tended to show that the effect of water flooding the track and running through the tunnel was to soften the track and render it dangerous in the transportation of passengers and freight, and that the dam is liable to overflow during high water in the future by such floating debris, and especially by reason of submerged cottonwood trees above the dam, which will decay and ultimately, by reason of such decay, wash down the stream and lodge against the superstructure and cause back water which will overflow the railroad track, wash through the tunnel and together with the danger of floods and rains constitute a continuing danger to the operation of the railroad.

It will be observed that after the Power Company had completed the dam it furnished and presented to the State Engineer an amended plan or map of the dam as constructed by it, showing the superstructure on the crest of the dam which was not shown in the prior drawings. This amended plan or map of the dam, as already stated, bears the approval of the State Engineer under date of July 2, 1913. It has no filing mark. The evidence tends to show that it was furnished in response to a request of the State Engineer for a report of the progress that the Power Company had made and was making in the construction of the dam. It is urged that the State Engineer's indorsement of approval of this so-called amended plan cured and legalized any departure from the original plan in the matter of the construction of the dam. It is apparent that the Power Company did not rely upon the indorsement of approval on this plan, for it was not furnished and so indorsed for nearly four years after the answer was filed and no supplementary answer was ever filed covering the matter. The evidence

tends to show that the stipulation which was carried into the temporary injunction, and which temporary injunction was afterward made perpetual, was to hold the question of the alleged nuisance in abeyance for a time or until that question could be tested out by observance of the effect of the spring rains and freshets, and much of the evidence was directed to the condition, utility and safety of the dam during that time and up to and at the time of the trial, but by no stipulation or agreement was the company authorized to apply *ex parte* which was done in this case, or otherwise to amend the plans of the dam as theretofore approved. There was evidence to the effect that the map was approved by the State Engineer and retained in his office simply to complete the record of the office. Its recitals should be construed in the light of the conditions existing at the time when the map was presented to the State Engineer and the purpose of so presenting it. The statute with reference to the construction of dams across the channel of running streams in force at the time and since the company built its dam is as follows:

"Sec. 825. Duplicate plans for any dam across the channel of a running stream, above five feet in height, or of any other dam intended to retain water above ten feet in height, shall be submitted to the State Engineer for his approval, and it shall be unlawful to construct such dam until the said plans have been approved.

"Sec. 826. The State Engineer shall have authority to examine and inspect, during construction, any dam authorized under the provisions of this chapter, or any ditch, canal or other work carrying over fifty cubic feet of water per second of time, and at the time of such inspection he may order the parties constructing such dam or other works to make any addition or alteration which he considers necessary for the security of the work or the safety of any person or persons residing on or owning land in the vicinity of such works."

By Section 827 it was provided: "Should any person or persons residing on or owning land in the neighborhood of

any irrigation works after completion, or in course of completion, apply to the State Engineer in writing desiring an inspection of such works, the State Engineer may order an inspection thereof.  Before doing so he may require the applicant for such inspection to make a deposit of a sum of money sufficient to pay the expenses of an inspection, and in case the application appears to him not to have been justified, he may cause the whole or part of such expense to be paid out of such deposit.  In case the application appears to the State Engineer to have been justified, he may require the company to pay the whole or any part of the expenses of the inspection, and the same may be collected in the same manner as is provided for the collection of the expenses of constructing headgates and measuring flumes."

It will be observed that the approval of the plan by the State Engineer under Section 825 was a condition precedent to the construction of the dam and unless so approved it would, by the terms of the section, be unlawful to construct it.  The statute does not provide for the approval of the plan after the construction as precedent authority or otherwise for building it.  Such plan so filed after the construction would furnish valuable information to the State Engineer in superintending the control and distribution of the water of the state, and it would also show whether the dam had been built upon the plan which had been approved as a necessary prerequisite to building it at all.  This map and plan were material evidence in this case and was introduced by the Power Company, and in so far as it showed the departure from the plan theretofore approved by the State Engineer as a condition precedent to constructing the dam was binding upon the Power Company.  The approval indorsed on the so-called amended plan on July 2, 1913, after the completion of the dam, was not the approval contemplated or required by statute as precedent authority to build the dam, nor is it here shown that the addition of the superstructure was in pursuance of any suggested or required change by the state acting through its State Engineer during the period of its construction and cannot for that reason be

reasonably said in so far as material changes were made to have been built with and by the approval of the state. It is apparent that Section 827 is inapplicable to this case, for that section by its terms refers to irrigation works, while, as already stated, the dam here was constructed for power purposes.

The trial court evidently gave the approval of this plan little or no weight in the trial of the case, for the state was not estopped by the record, nor was it estopped from maintaining this action to abate the alleged nuisance, no matter how it crept into existence. The defense of estoppel was not pleaded as a defense, but even had it been it could not have been sustained upon the evidence. The establishment of any structure under the sanction or approval of one of its officers if such structure becomes a nuisance is no excuse for the state to permit the continuance of such a nuisance, the removal or abating of which would clearly be within the duty and power of the state. At the time of the trial, as well as on July 2, 1913, the railroad had constructed its road through the gorge or canon upon a grade and elevation in view of the dam having a free and open spillway of 143 feet in length as contemplated and shown by the plans upon which the permit to construct the dam was originally granted. The evidence tends to show, and the court found upon that issue, that the operation of the railroad upon its present grade is attended with more than ordinarily hazardous risk to the traveling public, its employes, roadbed, equipment and freight in transit, during high water, by reason of the spillway being but 95 feet in length in the clear, when the plans called for 143 feet, and that the accumulation of debris during high water or freshets are a menace to its tracks and traffic and the lives of its employes and passengers. The Railroad Company owes duties to the public, some of which are peculiarly under the police regulations of the state, among which is the duty to safely transport the public. The railroad is a highway to be kept in repair and safety for the purposes of the business in which it is engaged for all the people of the state. The building of railroads opens up and

makes accessible the remote portions of the state and are the only, or at least the best, means for opening up such localities and carrying foodstuffs to the public.

It is contended that the effect of the decree is to take and destroy a part of defendant's property without just or due compensation, and comes within the inhibition of the constitution of the United States and of this state. It may be conceded that the superstructure of the dam was private property, but as constructed and maintained it was a constant menace in itself to the public and constituted a public nuisance. Its construction, even if a necessary part of the dam, was not approved by the state because not shown in the plan of the dam which was approved by the State Engineer as precedent authority to construct the dam and its construction was for that reason unlawful within the provision of the statute. The superstructure was so erected by the Power Company without authority of law, and whether constructed as a necessary part of the dam or not, the court found that it was a nuisance. The evidence supports the finding. The Power Company is in the attitude of having constructed a nuisance and is insisting that such nuisance shall not be destroyed or removed without compensation. The superstructure was and is not taken or sought for public use; but the Power Company was required by the decree to remove such public nuisance under and as an enforcement of the police power of the state. (8 Cyc. 1105.)

Plaintiff in error contends that the enforced removal of the superstructure, and that is as far as the decree of the trial court went, is unnecessary in order to lessen the depth of the water on the crest of the dam. That was also suggested in the state's evidence and it was pointed out that the wagon bridge could be built as a stone arch bridge. This question was squarely before the court and upon the evidence the court found that the superstructure was a public nuisance and ordered its removal and its decree was supported by the evidence. It was not material how it should be removed except that it should be done with the least possible damage and danger in effecting such removal. We find

the record free from error and the judgment will be affirmed.                                             *Affirmed.*

POTTER, C. J., and BEARD, J., concur.